Laurence M. Rosen, Esq. (SBN 219683)
THE ROSEN LAW FIRM, P.A.
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Tel: (213) 785-2610
Fax: (213) 226-4684
lrosen@rosenlegal.com
          -and-
Peretz Bronstein
Shimon Yiftach (SBN 277387)
BRONSTEIN GEWIRTZ & GROSSMAN
1925 Century Park East, Suite 1990
Los Angeles, CA 90067
Tel: (424) 322-0322
Fax: (310) 971-9996
peretz@bgandg.com
shimony@bgandg.com

Counsel for Plaintiff

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DANIEL ANSHEN, Individually and on behalf of all others similarly situated,<br><br>          Plaintiff,<br><br>          v.<br><br>FACEBOOK, INC., MARK ZUCKERBERG, DAVID WEHNER, AND SHERYL SANDBERG,<br><br>          Defendants. | **CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>JURY TRIAL DEMANDED |

- 1 -

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS

1     Plaintiff Daniel Anshen ("Plaintiff"), individually and on behalf of all other

2 persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's

3 complaint against Defendants (defined below), alleges the following based upon

4 personal knowledge as to Plaintiff and Plaintiff's own acts, and information and

5 belief as to all other matters, based upon, *inter alia*, the investigation conducted by

6 and through Plaintiff's attorneys, which included, among other things, a review of

7 the Defendants' public documents, announcements, United States Securities and

8 Exchange Commission ("SEC") filings, wire and press releases published by and

9 regarding Facebook, Inc. ("Facebook" or the "Company"), analysts' reports and

10 advisories about the Company, and information readily obtainable on the Internet.

11 Plaintiff believes that substantial evidentiary support will exist for the allegations

12 set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

14    1.    This is a federal securities class action on behalf of a class consisting

15 of all persons other than Defendants who purchased or otherwise acquired

16 publically traded securities of Facebook between May 5, 2014 and December 9,

17 2016, both dates inclusive (the "Class Period"), seeking to recover compensable

18 damages caused by Defendants' violations of the federal securities laws and to

19 pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of

20 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

## JURISDICTION AND VENUE

22    2.    The claims asserted herein arise under and pursuant to Sections 10(b)

23 and 20(a) of the Exchange Act (15 U.S.C. §§78j(b), 78b-1 and 78t(a)) and Rule

24 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

25    3.    This Court has jurisdiction over the subject matter of this action

26 pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act (15 U.S.C.

27 §78aa).

28

- 2 -

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS

4.     Venue is proper in this District pursuant to Section 27 of the Exchange Act (15 U.S.C. §78aa), and 28 U.S.C. §1391(b) as the Company maintains an office and Defendants conduct business in this District.

5.     In connection with the acts, conduct, and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## **PARTIES**

6.     Plaintiff Daniel Anshen, as set forth in the accompanying certification, incorporated by reference herein, purchased Facebook securities at artificially inflated prices during the Class Period and has been damaged thereby.

7.     Defendant Facebook operates www.facebook.com (the "Website"), a social networking website that allows registered users to create profiles, upload photos and videos, send messages and keep in touch with friends, family and colleagues. Facebook is incorporated in Delaware and maintains an office at 12777 West Jefferson Boulevard, Los Angeles, CA 90066. The Company's common stock is listed on the NASDAQ Global Select Market ("NASDAQ") under the ticker symbol "FB."

8.     Defendant Mark Zuckerberg ("Zuckerberg") is the founder of Facebook and has been the Chief Executive Officer ("CEO") of Facebook throughout the Class Period.

9.     Defendant David Wehner ("Wehner") has been the Chief Financial Officer ("CFO") of Facebook throughout the Class Period.

10.     Defendant Sheryl Sandberg ("Sandberg") has been the Chief Operating Officer ("COO") of Facebook throughout the Class Period.

- 3 -

11.     Defendants Zuckerberg, Wehner, and Sandberg are sometimes collectively referred to herein as "Individual Defendants."

12.     Each of the Individual Defendants:

    (a)     directly participated in the management of the Company;

    (b)     was directly involved in the day-to-day operations of the Company at the highest levels;

    (c)     was privy to confidential proprietary information concerning the Company and its business and operations;

    (d)     was involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

    (e)     was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and

    (f)     approved or ratified these statements in violation of the federal securities laws.

13.     Facebook is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

14.     The scienter of the Individual Defendants and other employees and agents of Facebook are similarly imputed to Facebook under *respondeat superior* and agency principles.

15.     Defendants Facebook and the Individual Defendants are collectively referred to herein as "Defendants."

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS

## SUBSTANTIVE ALLEGATIONS

### Background

16.     Facebook is essentially an advertising company that connects sellers and advertisers of consumer goods and services with its consumer users with the purpose of generating revenue, achieved primarily through the sale of advertising targeted at its consumer users.

17.     To further its financial objectives, Facebook provides business services through the Website to serve as a resource for businesses that want to use Facebook for marketing and advertising.

18.     Facebook generates revenue by selling advertisement placements over its website and mobile applications to sellers of consumer goods and services to help them reach consumers on the Website based on user information appropriated by Facebook. As such, Facebook enables companies to target consumers based on a variety of factors such gender, age, network, profile keywords, relationship status, all based on the manner in which the consumer interacts with the Website.

19.     Substantially all of Facebook's growth between 2014 and 2016 was based on paid advertisements that are placed on Facebook by advertisers to advertise business ideas and/or products by specifically targeting the millions of American consumers using the Website. According to a September 23, 2015 article entitled "Social Network Ad Revenues Accelerate Worldwide" published by the market-research website *eMarketer*, the average Facebook user generates $12.76 in yearly advertising revenue for Facebook, up from $10.03 in 2014. This figure is expected to rise still further for 2016 and 2017.

20.     As recently as November 3, 2016, in its quarterly report filed with the SEC, Facebook stated its advertising products comprised 97% of Facebook's revenue for 2016 and generated billions of dollars in revenue. Advertisers paid substantial sums of money to place their ads on Facebook based on the Company's

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS

representations about how many consumers can be reached and influenced by advertisements that appear on the Website.

### Materially False and Misleading Statements

21.    On May 5, 2014, Facebook posted a news release entitled "Introducing Video Metrics" to the Website's business page which touted Facebook's advertising products which would allow advertisers to measure the performance of their ads with metrics calculated by Facebook, stating in relevant part:

> With the goal of helping you better understand how people respond to your videos on Facebook, today we're announcing that new video metrics in Page Insights and Ads Reporting are coming soon.
>
> Today, as a Page owner, you can only see how many people started watching your video. ***When the new metrics roll out over the coming weeks, you will also see information like video views, unique video views, the average duration of the video view and audience retention.*** These new metrics are designed to help you learn what's resonating with people and determine how to more effectively create and promote your videos on Facebook.
>
> *       *       *
>
> See video views and the number of people that watched your video
>
> ***We'll show both the total number of video views and the number of people who watched your video. A "video view" is defined as a view of three seconds or more and will appear for all videos, including those that come to life as people scroll through News Feed. We've also renamed the "video plays" metric "clicks to play video." These register after a person has clicked to play a video and it has started.***
>
> (Emphasis added).

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS

22.     On February 24, 2015, the Company posted onto the Website's business section a letter entitled "Thank You" signed by Zuckerberg and Sandberg. The post also included a video narrated by Zuckerberg and Sandberg. Facebook announced that it had reached two million active advertisers with most of the gain coming from small businesses.

23.     On January 29, 2015, the Company filed a Form 10-K for the year ending December 31, 2014 (the "2014 10-K") with the SEC. The 2014 10-K was signed by Zuckerberg, Wehner, and Sandberg. The 2014 10-K also contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Zuckerberg and Wehner attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

24.     The 2014 10-K discussed Facebook's advertising revenue, stating in relevant part:

**Revenue**

We generate substantially all of our revenue from advertising and from fees associated with our Payments infrastructure that enables people to purchase virtual and digital goods from our developers.

**Advertising.** Our advertising revenue is generated by displaying ad products on Facebook properties, including our mobile applications, and third-party affiliated websites or mobile applications. Marketers pay for ad products either directly or through their relationships with advertising agencies, based on the number of clicks made by people, the number of actions taken by people, or the number of impressions delivered. ***We recognize revenue from the delivery of click-based ads in the period in which a person clicks on the content, and action-based ads in the period in which a person takes the action the marketer contracted for. We recognize revenue from the display of impression-based ads in the contracted period in which the impressions are delivered. Impressions are considered delivered when an ad is displayed to people. The number of ads we show is subject to methodological changes as we continue to evolve***

- 7 -

***our ads business and the structure of our ads products. We calculate price per ad as total ad revenue divided by the number of ads delivered, representing the effective price paid per impression by a marketer regardless of their desired objective such as impression, click, or action.***

(Emphasis added).

25.    On September 17, 2015, in a post entitled "New: 100% In-View Impression Buying and Ad Analytics Partnership with Moat" added to the Website's business section, Facebook announced that it was partnering with Moat, Inc. ("Moat"), an independent third-party, so Facebook advertisers could verify the data generated from user interaction with ads placed on Facebook, stating in relevant part:

**Video ad metrics measured and verified by Moat**

As more advertisers use video ads to build brand awareness and drive sales, they want to know that their video ad metrics are accurate. So we're partnering with Moat, an independent third-party, to verify Facebook video ads. As part of the partnership, we're integrating Moat technology to verify video ad views and view lengths, ***giving interested advertisers assurance that they know exactly how their video campaigns are performing.***

This partnership is part of our continued dedication to measuring Facebook ad effectiveness with independent third-parties.

*            *            *

To start, our partnership with Moat will focus on verifying video ad metrics. We plan to scale Moat verification to include all other types of News Feed ads, including 100% in-view impressions, and the Instagram platform.

26.    On January 28, 2016, the Company filed a Form 10-K for the year ending December 31, 2015 (the "2015 10-K") with the SEC. The 2015 10-K was signed by Zuckerberg, Wehner, and Sandberg. The 2015 10-K also contained

- 8 -

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS

signed SOX certifications by Zuckerberg and Wehner attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

27.    The 2015 10-K discussed Facebook's advertising revenue, stating in relevant part:

> **Revenue**
>
> **Advertising.** We generate substantially all of our revenue from advertising. Our advertising revenue is generated by displaying ad products on Facebook properties, including our mobile applications, and third-party affiliated websites or mobile applications. Marketers pay for ad products either directly or through their relationships with advertising agencies, based on the number of clicks made by people, the number of actions taken by people, or the number of impressions delivered. ***We recognize revenue from the delivery of click-based ads in the period in which a person clicks on the content, and action-based ads in the period in which a person takes the action the marketer contracted for. We recognize revenue from the display of impression-based ads in the contracted period in which the impressions are delivered. Impressions are considered delivered when an ad is displayed to people. The number of ads we show is subject to methodological changes as we continue to evolve our ads business and the structure of our ads products. We calculate price per ad as total ad revenue divided by the number of ads delivered, representing the effective price paid per impression by a marketer regardless of their desired objective such as impression, click, or action. For advertising revenue arrangements where we are not the primary obligor, we recognize revenue on a net basis.***

(Emphasis added).

28.    By February 10, 2016, the integration of Moat's video ad analytics was integrated into Facebook and active around the world.

29.    On March 2, 2016, Facebook posted to the Website's business section the article "Three Million Business Stores. What's Yours?" touting that "three

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS

million companies from all over the world, with more than 70% from outside of the US" advertise on the Website.

30.    In August 2016, Facebook privately began to notify a few of its large advertising clients of possible errors in Facebook's advertising metrics.

31.    On August 22, 2016, Facebook posted to the Website's business section the article, "Facebook Marketing Partners Specialty Showcase: Measurement," which discussed the importance of advertisers using independent third parties, such as Moat and others to verify the metrics and results of advertisements on Facebook, stating in relevant part:

> You're running lots of ads and campaigns, all of which results in lots of metrics: acquisition, impressions, reach. But who are the people who are using your mobile app, and what does all that in-app activity mean? By looking at the right data, and drawing the right conclusions, your efforts will be as powerful as they should be. As part of our Specialty Showcase series, highlighting our Marketing Partner specialties for Facebook, this week we look at how a Measurement Partner could help you find real value and meaning in all those stats.
>
> *        *        *
>
> Better Understand Ad Performance
>
> Our Marketing Partners build measurement solutions that work across devices and in apps in order to help you understand how people are using your app, what their lifetime value is and how you can optimize your campaigns accordingly. Because the more you know about the performance of your ads and campaigns, the more you can improve your future efforts. You can even measure the lift you receive from Facebook advertising by using Conversion Lift studies.
>
> The days of vanity metrics are over. Pair up with a Measurement Partner and get real value and insights about your campaigns.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS

32.     The statements referenced in ¶¶ 21-31 above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to Facebook's business, operational and financial results, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) Facebook's metrics to calculate the average time users spent watching videos was overestimated by between 60% and 80%; (2) Facebook provided inaccurate statistics to advertisers regarding the amount of activity their ads received on the Website; and (3) as a result, the Defendants' public statements were materially false and misleading at all relevant times.

**The Truth Begins to Emerge**

33.     After the market closed on September 22, 2016, the *Wall Street Journal* published the article "Facebook Overestimated Key Video Metric for Two Years," which was updated the following day, stating that the Company miscalculated the average time users spent watching videos on the Website, stating in relevant part:

> ***Big ad buyers and marketers are upset with Facebook Inc. after learning the tech giant vastly overestimated average viewing time for video ads on its platform for two years, according to people familiar with the situation.***
>
> Several weeks ago, Facebook disclosed in a post on its "Advertiser Help Center" that its metric for the average time users spent watching videos was artificially inflated because it was only factoring in video views of more than three seconds. The company said it was introducing a new metric to fix the problem.
>
> Some ad agency executives who were also informed by Facebook about the change started digging deeper, prompting Facebook to give them a more detailed account, one of the people familiar with the situation said.

- 11 -

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS

Ad buying agency Publicis Media was told by Facebook that the *earlier counting method likely overestimated average time spent watching videos by between 60% and 80%,* according to a late August letter Publicis Media sent to clients that was reviewed by The Wall Street Journal.

A spokeswoman for Publicis Media, a division of Publicis Groupe SA, referred calls to Facebook. Publicis was responsible for purchasing roughly $77 billion in ads on behalf of marketers around the world in 2015, according to estimates from research firm Recma.

GroupM, the ad buying unit of WPP PLC, also was notified of the discrepancy by Facebook, another person familiar with the matter said.

*On Friday, Facebook apologized. "The metric should have reflected the total time spent watching a video divided by the total number of people who played the video. But it didn't," said David Fischer, vice president of business and marketing partnerships, in a Facebook post. "While this is only one of the many metrics marketers look at, we take any mistake seriously."*

*Facebook had said in an earlier statement: "We recently discovered an error in the way we calculate one of our video metrics." It added: "This error has been fixed, it did not impact billing, and we have notified our partners both through our product dashboards and via sales and publisher outreach. We also renamed the metric to make it clearer what we measure. This metric is one of many our partners use to assess their video campaigns."*

The news is an embarrassment for Facebook, which has been touting the rapid growth of video consumption across its platform in recent years.

Due to the miscalculated data, marketers may have misjudged the performance of video advertising they have purchased from Facebook over the past two years. It also may have impacted their decisions about how much to spend on Facebook video versus other video ad sellers such as Google's YouTube, Twitter, and even TV networks.

- 12 -

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS

Media companies and publishers are affected, too, since they've been given inaccurate data about the consumption of their video content across the social network. Many use that information to help determine the types of content they post.

For the past two years Facebook only counted video views of more than three seconds when calculating its "Average Duration of Video Viewed" metric. Video views of under three seconds were not factored in, thereby inflating the average. Facebook's new metric, "Average Watch Time," will reflect video views of any duration. That will replace the earlier metric.

In its note to clients, Publicis said the change was an attempt to obfuscate Facebook's earlier miscalculations.

"In an effort to distance themselves from the incorrect metrics, Facebook is deprecating [the old metrics] and introducing 'new' metrics in September. Essentially, they're coming up with new names for what they were meant to measure in the first place," the memo said.

The miscounting could also fuel concerns among advertisers and media companies about the so-called "walled gardens" that companies including Facebook and Google are often described as operating. Both companies keep a tight grip on data, and only allow limited third-party tracking firms to plug into their systems.

Keith Weed, chief marketing officer of Unilever, said in an interview last year, tech companies that don't let third parties measure their platforms is equivalent to "letting them mark their own homework."

The Publicis note said, "This once again illuminates the absolute need to have 3rd party tagging and verification on Facebook's platform. Two years of reporting inflated performance numbers is unacceptable."

(Emphasis added).

- 13 -

34.     On or about September 23, 2016, David Fischer, Vice President of Business and Marketing Partnerships at Facebook, posted "Facebook Video Metrics Update" on Facebook's business page:

> Many of you may have seen the reports about our video metric miscalculation – I want to provide further clarity on the issue.
>
> ***About a month ago, we found an error in the way we calculate one of the video metrics on our dashboard – average duration of video viewed. The metric should have reflected the total time spent watching a video divided by the total number of people who played the video. But it didn't – it reflected the total time spent watching a video divided by only the number of "views" of a video (that is, when the video was watched for three or more seconds). And so the miscalculation overstated this metric. While this is only one of the many metrics marketers look at, we take any mistake seriously.***
>
> ***As soon as we discovered the discrepancy, we fixed it.*** We informed our partners and made sure to put a notice in the product itself so that anyone who went into their dashboard could understand our error. We have also reviewed our other video metrics on the dashboard and have found that this has no impact on video numbers we have shared in the past, such as time spent watching video or the number of video views. We want our clients to know that this miscalculation has not and will not going forward have an impact on billing or how media mix models value their Facebook video investments.
>
> But this isn't just about this error. This is about how seriously we take our partners' commitment to our platform, and how their investments with us wholly depend on the transparency with which we communicate. We know we can't have true partnerships with our clients unless we are upfront and honest with them, including when we make mistakes like this one. Our clients' trust and belief in our metrics is essential to us and we have to earn that trust. That is why we also give marketers choice by offering third-party video verification options with companies like Nielsen and Moat. We want marketers to measure video with us in the way they feel most comfortable.

- 14 -

> We sincerely apologize for the issues this has created for our clients. This error should not stand in the way of our ultimate goal, which is to do what's in the best interest of our partners and their business growth. We can only be successful if we're providing clients with the tools to drive their business forward, and we'll continue to deliver on that promise.

(Emphasis added).

35.    On this news, shares of Facebook fell $2.77 per share or over 2.12% over the next two trading days to close at $127.31 per share on September 26, 2016, damaging investors.

36.    After the market closed on November 2, 2016, Facebook held a conference call to discuss earning results from the third quarter of 2016. On this call, Defendant Wehner discussed the expected decrease in revenue from future ad sales and an increase of capital expenditures in 2017, stating in relevant part:

> Turning now to the outlook for the remainder of 2016, first, some color on revenue. We continue to expect that revenue growth rates will decline in Q4 as we lap a strong fourth quarter in 2015. ***We also continue to expect that our total payments and other fees revenue in Q4 will be lower than it was in the fourth quarter of last year.***
>
> *            *            *
>
> I also wanted to provide some brief comments on 2017. First on revenue, as I mentioned last quarter, we continue to expect that ad load will play a less significant factor driving revenue growth after mid-2017. Over the past few years, we have averaged about 50% revenue growth in advertising. Ad load has been one of the three primary factors fueling that growth. With a much smaller contribution from this important factor going forward, we expect to see ad revenue growth rates come down meaningfully.
>
> Secondly on expenses, though it is premature to provide specific expense guidance, as Mark mentioned, we anticipate 2017 will be an aggressive investment year. Adding top engineering talent remains

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS

one of our key investment priorities as we continue to execute on our 3, 5, and 10-year roadmap. We will continue to invest in our ability to recruit top technology talent, both in the Bay Area and beyond. In addition, we expect to grow capital expenditures substantially, as we continue to fund the ongoing data center expansion effort that we have underway.

(Emphasis added).

37.    On this news, shares of Facebook fell $7.17 per share or over 5.6% to close at $120.00 per share on November 3, 2016, further damaging investors.

38.    On or about November 16, 2016, Facebook issued a press release entitled "An Update on Metrics and Reporting," which disclosed additional faulty metrics, and announced that Facebook needed to update its metrics to provide clarity and confidence, stating in relevant part:

> ***Today we're updating our metrics to give our partners and the industry more clarity and confidence about the insights we provide.***
>
> We know that having access to reliable metrics is important to the millions of partners who use our services to grow their businesses. As our products evolve to meet the needs of the people and businesses that use them, our metrics will also evolve.
>
> Our goal going forward is to communicate more regularly about our metrics, so that our partners can focus on doing what they do best — serving their customers — with the best insights possible.
>
> **Increased Third-Party Verification**
>
> We believe strongly in third-party verification to prove the business value we're driving for our partners, and we have a long history of working with global industry leaders like comScore, Moat, Nielsen and Integral Ad Science (IAS). We're now exploring additional third-party reviews to validate the reporting we offer partners. We're also launching the ability to verify display impression data through our third-party viewability verification partners, including Moat, IAS and

- 16 -

comScore. This integration addresses requests we've received from partners for independent measurement of the amount of time ads are viewed on-screen.

For publishers, we're partnering with Nielsen to include Facebook video and Facebook Live viewership in Nielsen's Digital Content Ratings (DCR). This will give publishers access to third-party verification for video metrics and allow for comparable digital and TV metrics in Nielsen's Total Audience Measurement.

**Building More Measurement Solutions With Our Clients**

Our global Client Council has helped shape the direction of our products and how we approach measurement. Innovations such as conversion lift and mobile polling came out of direct conversations with our Client Council members. Given the Council's valuable insights and the growing need for measurement standards tied to business outcomes, we're now working with its members and other business and measurement executives to form a Measurement Council. We'll announce more details in the coming weeks.

**Regular and Clearer Communication On Metrics**

We've created a new internal review process to ensure our metrics are clear and up to date as our product offerings continue to evolve. As part of this process, we'll be communicating more regularly about updates we make. Communication will occur in a few ways, some of which are already happening:

**1)** *In-product definitions.* As we've routinely done in the past, we'll continue to include updates in-product where partners buy ads or access our reporting. When we make meaningful updates going forward, we'll continue surfacing them in-product.

**2)** *Through our client teams.* We'll continue to communicate important updates to metrics that impact our partners directly through our partner teams.

**3)** *Metrics FYI blog.* We know how important it is to be open about meaningful updates we make to our metrics, so we're creating a new

- 17 -

channel for regular information on metrics enhancements. (This blog will be similar to our <u>News Feed FYI blog</u>.)

Below is the first post in our <u>Metrics FYI blog series</u>, outlining the first set of updates we're making. Please note that we do not bill clients on the potential under-reporting/over-reporting metric issues mentioned below.

*     *     *

<u>Clarifying Metrics</u>

> ***We've been working for several months to improve reporting, and today we're announcing several updates intended to make information clearer and easier to understand.*** Some of the updates we're making are described below; for all we'll be updating our in-product definitions.
>
> • ***More descriptive names: We'll make updates now and in the coming months to ensure our metrics are clearly named*** (e.g. "view content" → "website view of content," and "video views" → "3-second video views").
>
> • ***Clarified calculations: We'll clarify some calculations to make sure they reflect how our products are being used by advertisers.*** For example, with the launch of Canvas in February, we gave advertisers the ability to create an immersive native experience on Facebook. Within Canvas, they can also link to offsite content on Facebook's in-app browser. While this experience is valuable to advertisers, the original intention of the Canvas View Duration metric was to capture time spent in Canvas. So we're clarifying the metric calculation to reflect that it excludes time spent outside Canvas (linking to offsite content).
>
> • ***More consistent definitions:*** We'll also update our tips section and glossaries across all of our ads tools to make sure we are explaining our metrics in consistent ways (including noting which insights are estimates). For example, as we have rolled out new immersive experiences on Facebook like Canvas and lead forms, the link clicks metric has evolved over time to include clicks to those on-Facebook destinations, in addition to clicks to a website off of Facebook. We had updated the definition of links clicks in our ad creation tools, and we are

- 18 -

now updating it across all of our ads tools. We're also clarifying the description of our video views metrics (3, 10 and 30 seconds) to include the term "aggregate," so as to more clearly explain it's based on aggregate view time of at least the specified number of seconds.

- *Better categorization:* We're making it easier for marketers to select certain metrics to include in their reports. To do this, we're creating a way to customize the columns in reports to reflect how marketers set up their ads. This will let advertisers have a specific advertising objective map directly to the metrics we show, like checkouts, leads or registrations

(Emphasis added).

39.     On this news, shares of Facebook fell $0.86 per share to close at $116.34 per share on November 17, 2016, further damaging investors.

40.     The statements referenced in ¶¶ 33-34, 36, 38 above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to Facebook's business, operational and financial results, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) Facebook's metrics to calculate the average time users spent watching videos was overestimated by between 60% and 80%; (2) Facebook provided inaccurate statistics to advertisers regarding the amount of activity their ads received on the Website; and (3) as a result, the Defendants' public statements were materially false and misleading at all relevant times.

41.     On December 9, 2016, which was subsequently updated on December 12, 2016, Facebook posted the article "Metrics FYI: Estimated Reach, Streaming Reactions, and Graph API" to the Website's business section.    The article discussed Facebook's additional changes to address problems with calculating metrics, stating in relevant part:

**Ads Creation—Improvement to Estimated Reach Methodology**

- 19 -

To help advertisers get a better view of the number of people they can expect to reach with ads, this week *we are updating how we calculate the numbers that appear in our estimated reach tool—found when creating an ad.* When an advertiser begins creating a campaign, the tool provides them with an estimate of both the potential overall reach and the estimated daily reach of their ad campaign. Note that this tool does not reflect reach for campaigns that have already run, nor does it affect any other reach metrics.

We're improving our methodology for sampling and extrapolating potential audience sizes. This will help to provide a more accurate estimate for a given target audience and to better account for audiences across multiple platforms (Facebook, Instagram and Audience Network). In most cases, advertisers should expect to see less than a 10% change (increase or decrease) in the audience sizes shown in the tool.

*     *     *

**Live Video Metrics in Page Insights—Reallocating Streaming Reactions Counts on Posts**

For Live videos, we introduced streaming reactions. Live video posts can have multiple reactions per person, since people can react at any moment of the live broadcast.

*In Page Insights, in the column for "Reactions on Post," however, we show only one reaction per unique user. We misallocated the extra reactions per user that happened during the live broadcast to the "Reactions from Shares of Post" section, instead of counting them in the "Reactions on Post" section, so we're making a change to correct it. Note that total counts were and are correct; some of them were just captured in the wrong reporting column when broken out.*

The fix for this issue will apply to newly created Live videos, starting mid-December. It will increase "Reactions on Post" by 500% on average and will decrease them on "Reactions from Shares of Post" by 25% on average (actual impact to specific videos may vary).

- 20 -

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS

\*      \*      \*

**Like, Share Buttons and Mobile Search Discrepancy**

***We have identified a discrepancy between the counts for the Like and Share Buttons via our Graph API and the counts when you enter a URL into the search bar in the Facebook mobile app*** (see screenshot below).

To clarify, our Like and Share button metrics pull:

- The number of likes of a URL off Facebook
- The number of shares of a URL off Facebook (this includes copy/pasting a link back to Facebook)
- The number of likes and comments on stories on Facebook about a URL

***We have found that there may be a difference between what these metrics count and what the mobile search query counts.*** We are looking into why inputting the URL as a search query in Facebook's mobile app might have corresponding numbers that can be higher or lower in certain cases. We are working to resolve this issue so that the Like and Share button metrics and our mobile search query metrics match up, and we will notify partners as soon as we have an update.

(Emphasis added).

42.     On this news, shares of Facebook fell $1.91 per share or over 1.5% to close at $117.77 per share on December 12, 2016, damaging investors.

43.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## <u>NO SAFE HARBOR</u>

44.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements

- 21 -

1    identifying important factors that could cause actual results to differ materially from

2    those in the purportedly forward-looking statements. Alternatively, to the extent

3    that the statutory safe harbor does apply to any forward-looking statements pleaded

4    herein, Defendants are liable for those false forward-looking statements because at

5    the time each of those forward-looking statements was made, the particular speaker

6    knew that the particular forward-looking statement was false, and/or the forward-

7    looking statement was authorized and/or approved by an executive officer of

8    Facebook who knew that those statements were false when made.

9                          **CLASS ACTION ALLEGATIONS**

10        45.    Plaintiff brings this action as a class action pursuant to Federal Rules

11   of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those

12   who purchased or otherwise acquired Facebook securities publically traded on

13   NASDAQ during the Class Period; and were damaged upon the revelation of the

14   alleged corrective disclosures. Excluded from the Class are Defendants herein, the

15   officers and directors of the Company at all relevant times, members of their

16   immediate families and their legal representatives, heirs, successors or assigns and

17   any entity in which Defendants have or had a controlling interest.

18        46.    The members of the Class are so numerous that joinder of all

19   members is impracticable. Throughout the Class Period, the Company's securities

20   were actively traded on the NASDAQ. While the exact number of Class members

21   is unknown to Plaintiff at this time, and can only be ascertained through

22   appropriate discovery, Plaintiff believes that there are at least hundreds of

23   members in the proposed Class. Members of the Class may be identified from

24   records maintained by Facebook or its transfer agent, and may be notified of the

25   pendency of this action by mail using a form of notice customarily used in

26   securities class actions.

27

28

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS

47.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

48.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

49.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;
- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Facebook;
- whether the Individual Defendants caused Facebook to issue false and misleading statements during the Class Period;
- whether Defendants acted knowingly or recklessly in issuing false and misleading statements;
- whether the prices of Facebook securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and,
- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

50.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members

- 23 -

may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

51.    Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- • Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- • the omissions and misrepresentations were material;

- • Facebook securities are traded in efficient markets;

- • the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- • the Company traded on NASDAQ, and was covered by multiple analysts;

- • the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- • Plaintiff and members of the Class purchased and/or sold Facebook securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

52.    Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

53.    Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

- 24 -

## ADDITIONAL SCIENTER ALLEGATIONS

54.     As alleged herein, Defendants acted with scienter in that each of them knowingly or recklessly participated in a scheme to defraud Plaintiffs and other purchasers and holders of the stock and profited from their participation in said scheme, as alleged herein.

55.     Each of the Defendants knew that ongoing errors in Facebook metrics were miscalculating how paid advertising was performing, resulting in inaccurate and unreliable data, the disclosure of which would result in the devaluation of the market price of Facebook stock.

56.     Each of the Defendants knew that failure to disclose the errors in the Facebook metrics would be enormously harmful to shareholders, including Plaintiffs and the other members of the Class.

57.     Each of Defendants was highly motivated to participate in the wrongdoing alleged herein, pursuant to which they were able to sell their Facebook shares at a cost much higher than their value once the metrics errors were disclosed.

## COUNT I
### Violation of Section 10(b) Of
### The Exchange Act Against and Rule 10b-5
### Promulgated Thereunder Against All Defendants

58.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

59.     During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (1) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (2) cause Plaintiff and other Class members to purchase Facebook's securities at artificially inflated prices.  In furtherance of this unlawful

- 25 -

scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

60.     Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for Facebook's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

61.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of Facebook as specified herein.

62.     These Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Facebook value and performance and continued substantial growth, which included the making of, or participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Facebook and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business that operated as a fraud and deceit upon the purchasers of Facebook securities during the Class Period.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS

63.     Each of the Defendants' primary liability, and controlling person liability, arises from the following facts: (1) Individual Defendants were high-level executives, directors, and/or agents of the Company during the Class Period and members of the Company's management team or had control thereof; (2) each of these Defendants, by virtue of his responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's financial condition; (3) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (4) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

64.     Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly.

65.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Facebook's securities was artificially inflated during the Class Period.  In ignorance of the fact that market prices of Facebook's publicly-traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclose in

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL
SECURITIES LAWS

public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Facebook securities during the Class Period at artificially high prices and were or will be damaged thereby.

66.    At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known the truth regarding Facebook financial results, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Facebook securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices that they paid.

67.    By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

68.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's common stock during the Class Period.

69.    This action was filed within two years of discovery of the fraud and within five years of plaintiff's purchases of securities giving rise to the cause of action.

## <u>COUNT II</u>
### <u>Violation of Section 20(a) Of<br>The Exchange Act Against Individual Defendants</u>

70.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

71.    Individual Defendants are sued herein as a controlling person of Facebook.

- 28 -

72.     By virtue of their high-level positions, agency, and their ownership and contractual rights, participation in and/or awareness and/or intimate knowledge of the misleading statements disseminated to the investing public, these defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the primary violator, including the content and dissemination of the various statements that plaintiff contends are false and misleading.  In particular, each defendant had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

73.     As set forth above, Facebook violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.

74.     By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

75.     This action was filed within two years of discovery of the fraud and within five years of Plaintiff's purchases of securities giving rise to the cause of action.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

A.     Determining that this action is a proper class action, designating Plaintiff as class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Class Counsel;

B.     Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages

- 29 -

1  sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial,

2  including interest thereon;

3        C.      Awarding Plaintiff and the Class their reasonable costs and expenses

4  incurred in this action, including counsel fees and expert fees;

5        D.      Such other and further relief as the Court may deem just and proper.

6  **<u>JURY TRIAL DEMANDED</u>**

7        Plaintiff hereby demands a trial by jury.

8

9  Dated: January 27, 2017              **THE ROSEN LAW FIRM, P.A.**

10                        /s/Laurence M. Rosen

11                        Laurence M. Rosen, Esq. (SBN 219683)

12                        355 S. Grand Avenue, Suite 2450
Los Angeles, CA 90071

13                        Telephone: (213) 785-2610

14                        Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

15

16                        **BRONSTEIN, GEWIRTZ & GROSSMAN**

17                        Peretz Bronstein

18                        Shimon Yiftach (SBN 277387)

19                        1925 Century Park East, Suite 1990
Los Angeles, CA 90067

20                        Tel: (424) 322-0322

21                        Fax: (310) 971-9996

22                        peretz@bgandg.com
shimony@bgandg.com

23

24                        *Counsel for Plaintiff*

25

26

27

28

- 30 -