Laurence M. Rosen, Esq. (SBN 219683)
THE ROSEN LAW FIRM, P.A.
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Tel: (213) 785-2610
Fax: (213) 226-4684
lrosen@rosenlegal.com
            -and-
Shimon Yiftach (SBN 277387)
BRONSTEIN GEWIRTZ & GROSSMAN
1925 Century Park East, Suite 1990
Los Angeles, CA 90067
Tel: (424) 322-0322
Fax: (212) 697-7296
shimony@bgandg.com

Counsel for Lead Plaintiffs

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DANIEL ANSHEN, Individually and on behalf of all others similarly situated,<br><br>  Plaintiffs,<br><br>  v.<br><br>FACEBOOK, INC., MARK ZUCKERBERG, DAVID WEHNER, AND SHERYL SANDBERG,<br><br>  Defendants. | Case No. 2:17-cv-00679-SVW-AGR<br><br>CLASS ACTION<br><br>**AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>JURY TRIAL DEMANDED |

Plaintiffs Daniel Anshen and Jung Passow ("Plaintiffs"), individually and on behalf of all other persons similarly situated, by Plaintiffs' undersigned attorneys,

- 1 -

for Plaintiffs' complaint against Defendants (defined below), allege the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of the Defendants' public documents, announcements, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Facebook, Inc. ("Facebook" or the "Company"), analysts' reports and advisories about the Company, interviews with former employees, and information readily obtainable on the Internet. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## <u>NATURE OF THE ACTION</u>

1.      This is a federal securities class action on behalf of a class consisting of all persons other than Defendants who purchased or otherwise acquired the common stock of Facebook between May 5, 2014 and November 2, 2016, both dates inclusive (the "Class Period"), seeking to recover compensable damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). Excluded from the class are all Defendants, the present and former officers and directors of Facebook and any subsidiary thereof, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.  Also excluded from the class are persons who have a net profit in purchases and sales of Facebook common stock or otherwise suffered no compensable damages under the securities laws during the Class Period.

2.      Facebook is a Fortune 500 company that operates various social media services, including the www.facebook.com website (the "Website").

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

3.     Facebook has 1.94 billion monthly active users.[1]  Facebook does not charge users to create a facebook.com account.  Once a user opens a Facebook account, the user can create a profile page, post content, connect with other users, and view content posted by other users.

4.     Rather than charging account holders to access facebook.com, Facebook generates revenue by selling advertising services.  Facebook earns almost all of its revenue from advertising.  For example, in 2015, Facebook's advertising revenue was over $17.0 billion, more than 95% of its total revenue.[2]  Advertisers paid substantial sums of money to place their ads on Facebook based on the Company's representations about how many consumers can be reached and influenced by advertisements that appear on the Website.

5.     One type of advertising service Facebook sells is video advertisements, where advertisers can pay money to have video displayed to Facebook users.  Facebook videos (including video ad products) autoplay by default.  Facebook allows users to scroll past autoplaying videos (including video ads) without ever turning on the sound or watching more than a few seconds of the video.

6.     Facebook in recent years has turned its focus to videos and video ad sales.  In a conference call with investors in 2016, Defendant Mark Zuckerberg, Facebook's CEO, said "We see a world where video is first, with video at the heart of all our apps and services."[3]

---

[1]  Facebook, *Company Info*, http://newsroom.fb.com/company-info/  (last accessed: June 13, 2017).

[2]  Facebook, Inc., Annual Report (Form 10-K) at 42 (Jan. 28, 2016).

[3] Facebook Profit Nearly Triples on Mobile Ad Sales and New Users, *The New York Times,* https://www.nytimes.com/2016/07/28/technology/facebook-earnings-mobile-ad-revenue.html?_r=0  (last accessed: June 16, 2017).

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

7.   Facebook video advertising services include marketing analytics, which enable advertisers to monitor and evaluate their video advertisements' performance.   Marketing analytics refers to the practice of measuring and analyzing the performance of an advertising or marketing campaign using data from a variety of metrics.  These metrics are invaluable to advertisers because they allow advertisers to determine where to spend advertising dollars and the effectiveness of the dollars spent.

8.   The importance of analytics is apparent in the competitive online video advertising industry.  YouTube, LinkedIn, Twitter, and Facebook all have online video advertising offerings and all emphasize the value of their analytics platforms.

9.   When Facebook was first entering the online video advertising space, it knew that its analytics would be the key to its success.  In a November 2013 private presentation to its advertising partners ("November 2013 Presentation"), Facebook discussed how to convince potential customers to purchase Facebook video advertisements instead of other video advertisements, such as YouTube or television ads.  The presentation acknowledged that one of the weaknesses of Facebook's video advertising platform was the relatively basic level of metrics it provided to video purchasers.  The presentation stated: "Currently, we only report on video plays, which is a weakness compared to YouTube, which reports on video views, completed views, and average duration of views.  We are working on building out our video insights to give advertisers a better sense for how videos are performing.  New video insights target launch: Q1 2014."[4]

---

[4] Josh Constine, *Leaked Facebook Video Ad Pitch Deck Reveals Plans to Steal TV and YouTube Dollars,* TechCrunch (Dec. 13, 2013), https://techcrunch.com/2013/12/13/facebook-vs-tv-and-youtube.   (last accessed: June 13, 2017).

- 4 -

10.    On May 5, 2014, Facebook announced that it would begin providing video advertisement purchasers with more analytics, including video views, completed views, and average duration of views, as part of Facebook's video advertising services.  Facebook told its advertisers that the purpose of the new analytics was to help video advertising purchasers "learn what's resonating with people and determine how to more effectively create and promote your videos on Facebook." Facebook said its "Audience Retention" analytics in particular, such as "Average Duration of Video Viewed," would assist video advertising purchasers in identifying underperforming videos and finding "the precise moment when most people lost interest and stopped watching." Facebook knew and admitted that "having access to reliable metrics is important to the millions of partners who use our services to grow their businesses."

11.    One of the most important analytics used in evaluating video advertisement performance is "Average Duration of Video Viewed," which is the average amount of time that users watched a video.  Average Duration of Video Viewed is a measure of "retention," which advertisers care about because the longer people watch an advertisement, the greater the advertisement's impact on the viewer.

12.    One study of video advertising campaigns on Facebook found that increasing retention of a viewer from the 3-second mark to the 10-second mark in a video resulted in a 57 percent increase in ad recall, a 103 percent increase in brand awareness, and a 64 percent increase in "purchase intent" (the intent to the purchase the advertised product). And because advertisers place higher value upon video advertisements that are viewed for longer periods, they are willing to pay more for such advertisements.[5]

---

[5] Facebook Business, *The Value of Video for Brands* (Mar. 17, 2015), https://www.facebook.com/business/news/value-of-video.   (last   accessed: June 13, 2017).

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

13.     Facebook told advertising purchasers that the "Average Duration of Video Viewed" was the "total time spent watching a video divided by the total number of people who have played the video"[6] (as a reasonable advertising purchaser, or any reasonable person, would expect).   The following formula depicts how Facebook defined "Average Duration of Video Viewed:"

$$\text{Average Duration of Video Viewed} = \frac{\text{Total time spent watching the video by all users combined}}{\text{Total number of users who spent any time watching the video}}$$

14.     After the close of trading on September 22, 2016, the *Wall Street Journal* published the article "Facebook Overestimated Key Video Metric for Two Years", revealing that Facebook had inflated the "Average Duration of Video Viewed" metric for two years, inflating figures by 60% to 80%.   In the article, David Fischer, Facebook's vice president of business and marketing partnerships, admitted that Facebook had misrepresented the "Average Duration of Video Viewed" metric to advertisers.

15.     The next day, on September 23, 2016, Fischer elaborated on the misrepresentation, stating that the "average duration of video viewed … metric should have reflected the total time spent watching a video divided by the total number of people who played the video. But it didn't – it reflected the total time spent watching a video divided by only the number of 'views' of a video (that is, when the video was watched for three or more seconds). And so the miscalculation overstated this metric."[7]

---

[6] Facebook, *How Is the "Average Duration of Video Viewed" Calculated?,* https://www.facebook.com/business/help/community/question/?id=10104227902985423. (last accessed: June 13, 2017).

[7] David Fischer, *Facebook Video Metrics Update*, Facebook.com (Sept. 23, 2016),   https://www.facebook.com/business/news/facebook-video-metrics-update. (last accessed: June 13, 2017).

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

16. On this news, shares of Facebook fell $2.77 per share or over 2.21% over the next two trading days to close at $127.31 per share on September 26, 2016.

17. Facebook's "Average Duration of Video Viewed" metric was inflated because when calculating the average, Facebook included the total time spent by under-3-second viewers in watching the video in the numerator of the fraction, but excluded these under-3-second views from the denominator of the fraction. Thus, Facebook's "Average Duration of Video Viewed" metric failed to align its criteria for eligible viewing time (the numerator) and its criteria for an eligible view (the denominator).

18. The impact of the numerator-denominator mismatch can be seen through the following illustration:

**Figure 1: Example - How Duration Metric *Should Have Been Calculated*, according to Facebook's Definition, For Videos Viewed by Four Users for 1, 2, 4, and 9 seconds respectively:**

$$Average\ Duration = \frac{1\ sec. + 2\ secs. + 4\ secs. + 9\ secs.}{4\ total\ users\ who\ watched\ the\ video} = \frac{16\ seconds}{4} = 4\ seconds$$

**Figure 2: Example - How Duration Metric *Was Actually Calculated*, from May 2014 to September 2016, For Videos Viewed by Four Users for 1, 2, 4, and 9 seconds respectively:**

$$Average\ Duration = \frac{1\ sec. + 2\ secs. + 4\ secs. + 9\ secs.}{2\ users\ who\ watched\ your\ video\ for\ 3\ or\ more\ seconds} = \frac{16\ seconds}{2} = 8\ seconds$$

19. As Figure 1 and Figure 2 show, by including the time spent watching the videos by users who viewed the videos for less than 3 seconds, while excluding

- 7 -

1   those "under 3-second" users from the denominator, the Average Duration of Video

2   Viewed metric not only failed to reflect its stated definition; it also created a highly

3   misleading result that favored Facebook.  This inflated metric thus made video

4   advertisements appear as if they were performing better on Facebook than they

5   actually were.

6       20.   As acknowledged by its private November 2013 Presentation and

7   public statements, Facebook created and publicized the new video analytics

8   platform and its video metrics to induce users to purchase Facebook's video

9   advertising services.

10       21.   In a lawsuit filed against Facebook by some of its video advertisers in

11   the United State District Court for the Northern District of California, the advertisers

12   state that: "Facebook's misrepresentation provided Facebook with an unfair

13   competitive advantage over other online video advertising platforms, such as

14   YouTube, LinkedIn, and Twitter," and that as a result, "induced video advertising

15   purchasers…to pay more for Facebook video advertising than they otherwise would

16   have been willing to pay."[8] In other words, if advertisers had known that they were

17   provided inflated metrics, they would have not chosen to advertise with Facebook,

18   or would have allocated a lower budget for Facebook advertising.

19       22.   Once online video advertisers learned of Facebook's deception and that

20   its video advertisements were not performing as well as Facebook claimed, they

21   immediately reduced their purchasing of video advertising on Facebook, leading to

22   an immediate and material decrease in current and expected revenue for Facebook.

23       23.   After the market closed on November 2, 2016, Facebook held a

24   conference call to discuss earnings results from the third quarter of 2016.  On this

25

26

27   [8] Class Action Complaint, *Quirky, Inc., et al. v. Facebook, Inc.,* Case No.

28   3:17-cv-00233-EDL (N.D. Cal.) (Dkt. #1).

- 8 -

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

call, Defendant David Wehner discussed the expected decrease in revenue from future ad sales, stating in relevant part:

> Turning now to the outlook for the remainder of 2016, first, some color on revenue. We continue to expect that revenue growth rates will decline in Q4 as we lap a strong fourth quarter in 2015. ***We also continue to expect that our total payments and other fees revenue in Q4 will be lower than it was in the fourth quarter of last year.***

24.     On this news, shares of Facebook fell $7.17 per share or over 5.6% to close at $120.00 per share on November 3, 2016, further damaging investors.

## JURISDICTION AND VENUE

25.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b), 78b-1 and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

26.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act (15 U.S.C. §78aa).

27.     Venue is proper in this District pursuant to Section 27 of the Exchange Act (15 U.S.C. §78aa), and 28 U.S.C. §1391(b) as the Company maintains an office and Defendants conduct business in this District.

28.     In connection with the acts, conduct, and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

29.     Plaintiffs, as set forth in their PSLRA certifications previously filed with the Court, acquired Facebook common stock at artificially inflated prices

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

1   during the Class Period and were damaged upon the public disclosure of true facts

2   concerning Facebook.

3        30.     Defendant Facebook operates www.facebook.com (the "Website"), a

4   social networking website that allows registered users to create profiles, upload

5   photos and videos, send messages and keep in touch with friends, family and

6   colleagues. Facebook is incorporated in Delaware and maintains an office at 12777

7   West Jefferson Boulevard, Los Angeles, CA 90066. The Company's common

8   stock is listed on the NASDAQ Global Select Market ("NASDAQ") under the

9   ticker symbol "FB."

10        31.     Defendant Mark Zuckerberg ("Zuckerberg") is the founder of

11   Facebook and has been the Chief Executive Officer ("CEO") of Facebook

12   throughout the Class Period.

13        32.     Defendant David Wehner ("Wehner") has been the Chief Financial

14   Officer ("CFO") of Facebook throughout the Class Period.

15        33.     Defendant Sheryl Sandberg ("Sandberg") has been the Chief

16   Operating Officer ("COO") of Facebook throughout the Class Period.

17        34.     Defendants Zuckerberg, Wehner, and Sandberg are sometimes

18   collectively referred to herein as "Individual Defendants."

19        35.     Each of the Individual Defendants:

20            (a)     directly participated in the management of the Company;

21            (b)     was directly involved in the day-to-day operations of the

22                     Company at the highest levels;

23            (c)     was privy to confidential proprietary information concerning

24                     the Company and its business and operations;

25            (d)     was involved in drafting, producing, reviewing and/or

26                     disseminating the false and misleading statements and

27                     information alleged herein;

28

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

(e)   was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and

(f)   approved or ratified these statements in violation of the federal securities laws.

36.   Facebook is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

37.   The scienter of the Individual Defendants and other employees and agents of Facebook are similarly imputed to Facebook under *respondeat superior* and agency principles.

38.   Defendants Facebook and the Individual Defendants are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS
### Background

39.   Facebook is essentially an advertising company that connects sellers and advertisers of consumer goods and services with consumer users with the purpose of generating revenue, achieved primarily through the sale of advertising targeted at its consumer users.

40.   To further its financial objectives, Facebook provides business services through the Website to serve as a resource for businesses that want to use Facebook for marketing and advertising.

41.   Facebook generates revenue by selling advertisement placements over its website and mobile applications to sellers of consumer goods and services to help them reach consumers on the Website based on user information appropriated by Facebook. As such, Facebook enables companies to target consumers based on

a variety of factors such as gender, age, network, profile keywords, and relationship status, all based on the manner in which the consumer interacts with the Website.

42.     Substantially all of Facebook's growth between 2014 and 2016 was based on paid advertisements that are placed on Facebook by advertisers to advertise business ideas and/or products by specifically targeting the millions of American consumers using the Website. According to a September 23, 2015 article entitled "Social Network Ad Revenues Accelerate Worldwide" published by the market-research website *eMarketer*, the average Facebook user generates $12.76 in yearly advertising revenue for Facebook, up from $10.03 in 2014.

43.     The Wall Street research firm Nomura predicted that by 2017, Facebook would generate $3.8 billion in annual revenue from video advertising alone.[9]  Based on Facebook's reported 2016 revenue of $27.6 billion, the $3.8 billion would represent approximately 14% of Facebook's total revenue.

44.     Facebook is perennially considered one of the most desirable companies to work for in America.[10]  With its impressive perks, high salary, and popularity, Facebook boasts of stringent hiring standards and is known to attract exceptionally smart and talented employees.[11]

45.     Given the high intelligence of their employees, particularly of the data scientists that create the software to monitor the advertising metrics, it is

---

[9]  http://variety.com/2015/digital/news/facebooks-bite-into-tv-social-giant-to-hit-3-8-billion-in-video-ad-sales-by-2017-analyst-says-1201454287/   (last accessed: June 14, 2017)

[10]  *See, e.g.,* The 50 Best Companies to Work for In America, http://www.businessinsider.com/best-companies-to-work-for-in-america-2015-4 (last accessed: June 13, 2017).

[11]  *See, e.g.,* How Facebook is Recruiting Exceptional Talent Today, http://www.huffingtonpost.com/meghan-m-biro-/how-facebook-is-recruiting-exceptional-talent-today_b_9628940.html (last accessed: June 13, 2017).

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

impossible that Facebook mistakenly used this misleading advertising metric. Facebook included all the time spent viewing videos for less than three seconds, but excluded from the denominator the number of videos viewed when calculating the critical metric of Average Duration of Videos Viewed.   This obvious inconsistency in this simple metric cannot have been the product of an innocent mistake or even negligence.  It was clearly a deliberate effort to mislead advertisers and investors for Facebook's financial gain.

### The Importance of Metrics

46.     Marketing analytics refers to the practice of measuring and analyzing the performance of an advertising or marketing campaign using data from a variety of metrics.  One of the main selling points of online advertising is that it offers more detailed and closer to real-time marketing analytics than traditional media (such as television or radio), and online advertisement sellers such as Facebook have promoted their marketing analytics as a prime reason that advertisers should purchase advertisements on their platforms. Online advertisers do so because advertisers use these analytics to determine where to spend advertising dollars based on the effectiveness of the dollars spent. Analytics allows companies to make informed decisions about how to allocate their limited marketing budgets across different mediums (such as television, YouTube, or Facebook), to determine which advertising campaigns to "expand" and which to "kill," and to adjust or allocate advertising in different markets and on different platforms.  Accordingly, it has become a standard practice in the industry for online advertisers like Facebook to include marketing analytics as part of their advertising services, and online advertising purchasers expect that any advertising they purchase will include marketing analytics to evaluate the advertising's performance.

- 13 -

47.     In the competitive online video advertising market, YouTube, LinkedIn, Twitter, and Facebook all have online video advertising offerings and all boast of the value of their analytics platforms.

48.     Indeed, when Facebook first entered the video advertising space, it knew that its analytics would be the key to its success. In a November 2013 private presentation to its advertising partners ("November 2013 Presentation"), Facebook provided talking points on how to convince potential customers to purchase Facebook video advertisements instead of other video advertisements, such as YouTube advertisements or television advertisements. The presentation acknowledged that one of the weaknesses of Facebook's video advertising platform was the relatively basic level of metrics it provided to video purchasers. The presentation stated, "Currently, we only report on video plays, which is a weakness compared to YouTube, which reports on video views, completed views, and average duration of view. We are working on building out our video insights to give advertisers a better sense for how videos are performing. New video insights target launch: Q1 2014."

<u>**Materially False and Misleading Statements**</u>

49.     In May 2014, Facebook began providing video advertising purchasers with more analytics, including video views, completed views, and average duration of views, as part of Facebook's effort to boost its advertising services and better compete in the competitive online advertising industry.

50.     On May 5, 2014, Facebook posted a news release entitled "Introducing Video Metrics" to the Website's business page [12] which touted Facebook's advertising products which would allow advertisers to measure the

---

[12]     *See*     https://www.facebook.com/business/news/Coming-Soon-Video-Metrics (last accessed: June 16, 2017).

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

performance of their ads with metrics calculated by Facebook, stating in relevant part:

> With the goal of helping you better understand how people respond to your videos on Facebook, today we're announcing that new video metrics in Page Insights and Ads Reporting are coming soon.
>
> Today, as a Page owner, you can only see how many people started watching your video. ***When the new metrics roll out over the coming weeks, you will also see information like video views, unique video views, the <u>average duration of the video view and audience retention.</u>*** These new metrics are designed to help you learn what's resonating with people and determine how to more effectively create and promote your videos on Facebook.

(Emphasis added).

51.      In the same announcement, Facebook said that its Audience Retention analytics in particular, such as Average Duration of Video Viewed, would assist video advertisers in identifying underperforming videos and finding "the precise moment when most people lost interest and stopped watching."  Facebook knew and admitted that "having access to reliable metrics is important to the millions of partners who use our services to grow their businesses."

52.      Facebook represented that the "Average Duration of Video Viewed" was the "total time spent watching a video divided by the total number of people who have played the video."[13]  This is a simple calculation and all reasonable people, and reasonable advertising purchasers, would expect that the same videos viewed included in the numerator would also be included in the denominator.

53.      On January 29, 2015, the Company filed a Form 10-K for the year ending December 31, 2014 (the "2014 10-K") with the SEC. The 2014 10-K was

---

[13] Facebook, *How Is the "Average Duration of Video Viewed" Calculated?*, https://www.facebook.com/business/help/community/question/?id= 10104227902985423 (last accessed: June 13, 2017).

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

signed by Zuckerberg, Wehner, and Sandberg. The 2014 10-K also contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Zuckerberg and Wehner attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

54.     The 2014 10-K discussed Facebook's advertising metrics, stating in relevant part:

> If marketers, developers, or investors do not perceive our user metrics to be accurate representations of our user base, or if we discover material inaccuracies in our user metrics, our reputation may be harmed and marketers and developers may be less willing to allocate their budgets or resources to Facebook, which could negatively affect our business and financial results.

55.     This statement was repeated in Facebook's Form 10-K for the year ending December 31, 2015 (the "2015 10-K") filed on January 28, 2016 with the SEC. The 2015 10-K was signed by Zuckerberg, Wehner, and Sandberg. The 2015 10-K also contained signed SOX certifications by Zuckerberg and Wehner attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

56.     The statements referenced in ¶¶50-55 above were materially false and/or misleading because they failed to disclose that Facebook's representation of performance metrics for Average Duration of Video Viewed was actually inflated by between 60% and 80%.

57.     Specifically, the statements in ¶¶54-55 are false and misleading because they warn of a hypothetical (i.e. that Facebook's reputation *may be* hurt and its revenue *may* suffer *if* there are inaccuracies in Facebook's advertising metrics) when Facebook was *already engaged* in deceptive practice to inflate its video advertising metrics.

- 16 -

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

1

**The Truth Begins to Emerge**

2

58.    After the market closed on September 22, 2016, the *Wall Street*

3

*Journal* published the article "Facebook Overestimated Key Video Metric for Two

4

Years," which was updated the following day, stating that the Company

5

miscalculated the average time users spent watching videos on the Website, stating

6

in relevant part:

7

8

9

10

> **Big ad buyers and marketers are upset with Facebook Inc. after**
> **learning the tech giant vastly overestimated average viewing time for**
> **video ads on its platform for two years, according to people familiar**
> **with the situation.**
> [.....]

11

12

13

14

> Ad buying agency Publicis Media was told by Facebook that the
> **earlier counting method likely overestimated average time spent**
> **watching videos by between 60% and 80%,** according to a late
> August letter Publicis Media sent to clients that was reviewed by The
> Wall Street Journal.
> […]

15

16

17

18

19

> **On Friday, Facebook apologized. "The metric should have reflected**
> **the total time spent watching a video divided by the total number of**
> **people who played the video. But it didn't," said David Fischer, vice**
> **president of business and marketing partnerships, in a Facebook**
> **post. "While this is only one of the many metrics marketers look at,**
> **we take any mistake seriously."**
> […]

20

21

22

23

24

> **Due to the miscalculated data, marketers may have misjudged the**
> **performance of video advertising they have purchased from**
> **Facebook over the past two years. It also may have impacted their**
> **decisions about how much to spend on Facebook video versus other**
> **video ad sellers such as Google's YouTube, Twitter, and even TV**
> **networks.**

25

26

27

28

> Media companies and publishers are affected, too, since they've been
> given inaccurate data about the consumption of their video content
> across the social network. Many use that information to help
> determine the types of content they post.

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

For the past two years Facebook only counted video views of more than three seconds when calculating its "Average Duration of Video Viewed" metric. Video views of under three seconds were not factored in, thereby inflating the average. Facebook's new metric, "Average Watch Time," will reflect video views of any duration. That will replace the earlier metric.

In its note to clients, Publicis said the change was an attempt to obfuscate Facebook's earlier miscalculations.

"In an effort to distance themselves from the incorrect metrics, Facebook is deprecating [the old metrics] and introducing 'new' metrics in September. Essentially, they're coming up with new names for what they were meant to measure in the first place," the memo said.

The miscounting could also fuel concerns among advertisers and media companies about the so-called "walled gardens" that companies including Facebook and Google are often described as operating. Both companies keep a tight grip on data, and only allow limited third-party tracking firms to plug into their systems.

Keith Weed, chief marketing officer of Unilever, said in an interview last year, tech companies that don't let third parties measure their platforms is equivalent to "letting them mark their own homework."

The Publicis note said, "This once again illuminates the absolute need to have 3rd party tagging and verification on Facebook's platform. Two years of reporting inflated performance numbers is unacceptable."

(Emphasis added).

59.    The next day, on September 23, 2016, David Fischer, Vice President of Business and Marketing Partnerships at Facebook, admitted that Facebook had misrepresented its Average Duration of Video Viewed metric. He wrote that the "average duration of video viewed … metric should have reflected the total time spent watching a video divided by the total number of people who played the

- 18 -

video. But it didn't – it reflected the total time spent watching video divided by only the number of 'views' of a video (that is, when the video was watched for three or more seconds). And so the miscalculation overstated this metric."

60.     On this news, shares of Facebook fell $2.77 per share, or over 2.12%, over the next two trading days to close at $127.31 per share on September 26, 2016, damaging investors.

61.     Indeed, Facebook's inflated metrics made video advertisements appear as if they were performing much better on Facebook than they actually were.

62.     In a class action lawsuit filed by several video advertisers against Facebook, the advertisers stated, among other things, that:

> "Video advertising purchasers…viewed the "Average duration of Video Viewed"…as important metrics because users are more likely to remember a video advertisement and be affected by it if they watched a longer portion of the advertisement."[14]

63.     The advertisers alleged that had they known Facebook was providing them with inflated Average Duration of Video Viewed Metrics, they would not have advertised with Facebook, or would have paid less to advertise on Facebook.[15]

64.     Thus, once online video advertisers learned of Facebook's deception and that its video advertisements were not performing as well as Facebook claimed, they immediately reduced their purchasing of video advertising on Facebook, leading to an immediate and material decrease in current and expected revenue for Facebook.

---

[14] Consolidated Amended Class Action Complaint, *Quirky, Inc., et al. v. Facebook, Inc.,* Case No. 3:17-cv-00233-EDL (N.D. Cal.) (Dkt. #34), at ¶35.

[15] *Id.* at ¶¶36-39.

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

65.     After the market closed on November 2, 2016, Facebook held a conference call to discuss earning results from the third quarter of 2016. On this call, Defendant Wehner discussed the expected decrease in revenue from future ad sales, stating in relevant part:

> Turning now to the outlook for the remainder of 2016, first, some color on revenue. We continue to expect that revenue growth rates will decline in Q4 as we lap a strong fourth quarter in 2015. *We also continue to expect that our total payments and other fees revenue in Q4 will be lower than it was in the fourth quarter of last year.*

66.     On this news, shares of Facebook fell $7.17 per share, or over 5.6%, to close at $120.00 per share on November 3, 2016, further damaging investors.

## ADDITIONAL ALLEGATIONS SHOWING SCIENTER

67.     In the private November 2013 Presentation, Facebook admitted that they would need to create new video analytics and metrics in order to induce users to purchase Facebook's video advertising services.

68.     Because of the importance and profitability of video advertising, Zuckerberg has been heavily involved in all aspects of Facebook's development of video ads.  According to a *Wall Street Journal* article dated August 8, 2013, former employees of Facebook said that Zuckerberg "set an especially high bar for the [video advertising] team."  The article also states that, according to two people close to the Company, Zuckerberg "has been heavily involved in the development of video ads, approving changes at every turn and pushing his team to repeatedly test with small groups…"[16]

---

[16] Facebook Moves Cautiously on Video Ads: CEO Zuckerberg Tries to Find Right Balance for Users and Advertisers, *The Wall Street Journal,* https://www.wsj.com/article_email/SB100014241278873238382045786546 84050767080-lMyQjAxMTAzMDAwOTEwNDkyWj.html  (last  accessed: June 16, 2017).

69.     A Data Scientist who worked at Facebook from August 2014 to February 2016 ("CW1") told Plaintiffs' investigator that data pertaining to video ad metrics were widely available at the Company and all levels of Facebook employees involved in advertising sales, including high-level management, had access to the data. [17]   CW1 also stated that Facebook was a metrics-driven company, and employees' job performance was judged on improving metrics. Everyone at Facebook was given goals that involved improving metrics, and a lot of attention was paid to those metrics. CW1 noted that all levels of employees were reviewing the video advertising data.

70.     CW1 also stated that Zuckerberg, in 2015 or 2016, spoke at a Company-wide meeting in which he emphasized Facebook's new focus on videos and video advertising saying that video advertising was really important for Facebook now.  Zuckerberg said that Facebook wanted to become "video centric".

71.     The goal, CW1 said, was to "go after TV ad dollars," which is mostly video ads.

72.     YouTube had been very successful earning money from video ads. CW1 said that Facebook wanted to go after the video ad dollars that YouTube had been earning. It was positioning the brand that Facebook is more video focused.

73.     Due to the new focus on video advertising dollars, CW1 believed that upper management would have been keeping their eye on the metrics for videos and video ads.

74.     "It was a strategic initiative," CW1 said. As a result CW1 believed Zuckerberg and Sheryl Sandberg were looking closely at the video ad metrics.

75.     Confidential witness two ("CW2") was a Facebook and Instagram Marketing Expert working for Revana, a third-party company that contracted with

---

[17] CW1 reported to Jeff Amlin.

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

1  Facebook to offer Facebook advertisers assistance with managing their ads. He/she
2  reported to Charrie Larkin, Sales Director at Revana.

3       76.    CW2's job involved helping Facebook and Instagram advertising
4  customers learn how to manage their ad accounts, including providing tutorials on
5  how to review their ad metrics.

6       77.    CW2 stated that Facebook initially had about three metrics for video
7  ads, which included how many people viewed the ads and the average view time
8  per video.

9       78.    When asked if average view time was an important metric for
10 advertisers, CW2 said, "Absolutely. It was one of the metrics they were most
11 interested in".

12      79.    CW2 stated that advertisers definitely used average view time metrics
13 to decide whether to advertise on Facebook.  "They were saying, 'My video is
14 getting more views, longer engagement on Facebook (than on other sites), so yeah,
15 I'm going to focus on Facebook" for advertising,'" CW2 said.

16      80.    CW2 stated that Facebook was very focused on taking market share of
17 advertising from YouTube.

18      81.    During her time working for Facebook (on contract through Revana),
19 CW2 was aware that the company was hyper-focused on increasing its market
20 share for video ads sales.

21      82.    CW2 said that Facebook wanted to take business away from
22 YouTube.   CW2 stated "they really wanted to capture that video market."

23      83.    CW2 said Facebook's goal was to attract advertisers, who were
24 recognizing that TV ads were losing their impact, and offer advertisers a better and
25 more attractive platform than YouTube.

26      84.    Because Facebook's strategic initiative was to take market share of
27 video ad dollars from YouTube and increase its video ad revenue, Facebook was
28

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

highly motivated to convince advertisers that the average video view time of Facebook users was higher than YouTube's and other competing sites in order to win more video ad dollars.

85.    It is common sense, and obvious to any reasonable person, that to calculate Average Duration of Video Viewed, one would take the total time spent watching a video and divide that by the total number of people who have played the video.  Indeed, it is such a simple calculation that Facebook, whose employees are among the most talented engineers and programmers in the world, should not have gotten it wrong unless the senior management of Facebook instructed the programmers to calculate this metric in such a deceptive way so as to mislead advertisers in order to better position itself in the competitive online advertising industry and sell more ads.

86.    Advertisers, in their class action lawsuit against Facebook, claimed that they would not have advertised on Facebook, or would have spent far less money advertising on Facebook, had they been given true and accurate metrics rather than the inflated figures.

87.    Facebook's metrics were not audited or accredited by the Media Rating Council, the marketing industry's standard-bearer for accurate measurements.  Even though Facebook engaged Moat, a third-party company, to verify "video ad views and view lengths" in late 2015, Facebook was still the source of all data on video duration.  Moat would not have discovered the inflated Average Duration of Video Viewed metric because it does not actually track the specific metric that Facebook was found to be overcounting.[18]  According to Jonah Goodhart, the CEO of Moat, "Moat's reporting is independent of Facebook's and

---

[18] A Primer on the Facebook Measurement Wars, *The Wall Street Journal,* October 14, 2016.

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

we don't check Facebook's own reporting.  We also don't report the exact metric that was referenced in the Facebook calculation."

## CLASS ACTION ALLEGATIONS

88.     Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all those who purchased or otherwise acquired Facebook securities publically traded on NASDAQ during the Class Period (the "Class") and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of the Company at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

89.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, the Company's securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiffs at this time, and can only be ascertained through appropriate discovery, Plaintiffs believes that there are at least hundreds of members in the proposed Class. Members of the Class may be identified from records maintained by Facebook or its transfer agent, and may be notified of the pendency of this action by mail using a form of notice customarily used in securities class actions.

90.     Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

91.     Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class

- 24 -

and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

92.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Facebook;

- whether the Individual Defendants caused Facebook to issue false and misleading statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading statements;

- whether the prices of Facebook securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and,

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

93.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

94.     Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

- • Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- • the omissions and misrepresentations were material;

- • Facebook securities are traded in efficient markets;

- • the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- • the Company traded on NASDAQ, and was covered by multiple analysts;

- • the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- • Plaintiffs and members of the Class purchased and/or sold Facebook securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

95. Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

96. Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I
### Violation of Section 10(b) Of
### The Exchange Act and Rule 10b-5
### Promulgated Thereunder Against All Defendants

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

97.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

98.     During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (1) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (2) cause Plaintiffs and other Class members to purchase Facebook's securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

99.     Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for Facebook's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

100.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of Facebook as specified herein.

101.    These Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Facebook value and performance and continued substantial growth,

which included the making of, or participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Facebook and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business that operated as a fraud and deceit upon the purchasers of Facebook securities during the Class Period.

102.   Each of the Defendants' primary liability, and controlling person liability, arises from the following facts: (1) Individual Defendants were high-level executives, directors, and/or agents of the Company during the Class Period and members of the Company's management team or had control thereof; (2) each of these defendants, by virtue of his or her responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's financial condition; (3) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (4) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

103.   Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly.

- 28 -

104.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Facebook's securities was artificially inflated during the Class Period.  In ignorance of the fact that market prices of Facebook's publicly-traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclose in public statements by Defendants during the Class Period, Plaintiffs and the other members of the Class acquired Facebook securities during the Class Period at artificially high prices and were or will be damaged thereby.

105.    At the time of said misrepresentations and omissions, Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiffs and the other members of the Class and the marketplace known the truth regarding Facebook financial results, which were not disclosed by Defendants, Plaintiffs and other members of the Class would not have purchased or otherwise acquired their Facebook securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices that they paid.

106.    By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

107.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's common stock during the Class Period.

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

108.   This action was filed within two years of discovery of the fraud and within five years of Plaintiffs' purchases of securities giving rise to the cause of action.

**COUNT II**
**Violation of Section 20(a) Of**
**The Exchange Act Against Individual Defendants**

109.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

110.   Each of the Individual Defendants is sued herein as a controlling person of Facebook.

111.   By virtue of their high-level positions, agency, and their ownership and contractual rights, participation in and/or awareness and/or intimate knowledge of the misleading statements disseminated to the investing public, these defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the primary violator, including the content and dissemination of the various statements that Plaintiffs contend are false and misleading.  In particular, each defendant had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

112.   As set forth above, Facebook violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this complaint.

113.   By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

1   114.    This action was filed within two years of discovery of the fraud and

2   within five years of Plaintiffs' purchases of securities giving rise to the cause of

3   action.

4   ### PRAYER FOR RELIEF

5   **WHEREFORE**, Plaintiffs pray for relief and judgment, as follows:

6   A.    Determining that this action is a proper class action, designating

7   Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil

8   Procedure and Plaintiffs' counsel as Class counsel;

9   B.    Awarding compensatory damages in favor of Plaintiffs and the other

10  Class members against all defendants, jointly and severally, for all damages

11  sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial,

12  including interest thereon;

13  C.    Awarding Plaintiffs and the Class their reasonable costs and expenses

14  incurred in this action, including counsel fees and expert fees;

15  D.    Such other and further relief as the Court may deem just and proper.

16  ### JURY TRIAL DEMANDED

17  Plaintiffs hereby demand a trial by jury.

18

19  Dated: June 16, 2017          **THE ROSEN LAW FIRM, P.A.**

20                               /s/Laurence M. Rosen

21                               Laurence M. Rosen, Esq. (SBN 219683)

22                               355 S. Grand Avenue, Suite 2450

23                               Los Angeles, CA 90071

24                               Tel: (213) 785-2610
                                 Fax: (213) 226-4684

25                               lrosen@rosenlegal.com

26                               **BRONSTEIN, GEWIRTZ &**
                                 **GROSSMAN**

27                               Shimon Yiftach (SBN 277387)

28

- 31 -

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

1925 Century Park East, Suite 1990
Los Angeles, CA 90067
Tel: (424) 322-0322
Fax: (212) 697-7296
shimony@bgandg.com

*Counsel for Lead Plaintiffs*

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### CERTIFICATE OF SERVICE

I, Laurence Rosen, hereby declare under penalty of perjury as follows:

I am attorney with The Rosen Law Firm, P.A., with offices at 355 South Grand Avenue, Suite 2450, Los Angeles, CA, 90071. I am over the age of eighteen.

On June 16, 2017, I electronically filed the foregoing AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS with the Clerk of the Court using the CM/ECF system, which sent notification of such filing to counsel of record.

Executed on June 16, 2017

/s/ Laurence Rosen
Laurence Rosen

AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF
THE FEDERAL SECURITIES LAWS